IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


GREGORY STYERS,                    :
          Plaintiff
                                   :

          vs.                      :   CIVIL NO. 1:CV-05-2127

BRET WAGGONER,                     :
JAMES GAROFALO,
RICHARD ZENK,                      :
DAVID GUIDO,
          Defendants               :


*M E M O R A N D U M*

I.   *Introduction.*

          We are considering the defendants' motion for summary
judgment. Plaintiff, Gregory Styers, a trooper with the
Pennsylvania State Police (PSP), was a "Pilot in Command" (PIC) in
Aviation Patrol Unit III (APUIII). He piloted a helicopter. In
2001, he was transferred. Plaintiff successfully grieved the
transfer, and the arbitrator ordered that he be returned to the
unit and "made whole." Styers returned to the unit in September
2003, but did not become a PIC again, before transferring out in
April 2004.

          Plaintiff filed this action alleging that upon his
return to the unit, the defendants retaliated against him for the
exercise of his First Amendment right to grieve his transfer and
for raising certain concerns he had about the helicopters in
service at the unit. The defendants are Bret Waggoner, at the time
PSP's aviation section commander, in charge of all aviation units

statewide; James Garofalo, a PSP captain; Richard Zenk, a PSP major; and David Guido, a PSP sergeant and helicopter pilot at APU III.

The retaliatory conduct allegedly consisted of: (1) imposing an unnecessary requirement that Plaintiff have 150 hours of helicopter retraining before regaining his PIC status; (2) refusing him the opportunity to get the 150 hours of retraining; (3) disciplining him for attending a preliminary hearing in his dress uniform; (4) forcing him to wait for a properly fitting flight helmet; and (5) making it difficult to get a replacement clip for his gun. Plaintiff also refers to this conduct as a hostile work environment or as a hostile and unsafe environment.

We will examine the summary-judgment motion under the well established standard. *See Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007). We will thus "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Id.* (quoted case omitted).

II.    *Background.*

For the most part, we take this background from Defendants' statement of material facts, tracking the statements closely and sometimes making unattributed quotations from Defendants' language, since Plaintiff agrees with most of the statements. But in keeping with our obligation on summary

judgment, we will rely on Plaintiff's version of events where appropriate.

   A.   *Restoring Plaintiff to PIC Status.*

   APU III is part of the Bureau of Emergency and Special Operations (BESO) of the Pennsylvania State Police. There are seven APUs. Plaintiff was a PIC in APU III. Transferred out in 2001, he contested the transfer by filing a grievance.

   In July 2003, APU III purchased two Agusta A119 helicopters. Before the Agusta helicopter, the primary aircraft for APU III was a Bell Long Ranger, which Styers was qualified to fly. Because the Agusta helicopters had just been purchased, none of the pilots, some of them PIC, had experience with them in July 2003, and they were trained in them at that time.

   In September 2003, after an absence of three years, Styers returned to APU III after winning his grievance. Guido told him that he did not agree with the arbitrator's decision but as part of the arbitration award, recognized that Styers was "to be made whole" by the State Police upon his return. According to Guido, he attempted to do that.

   Styers had no experience with the Agusta. Defendant Guido talked with Lt. Gerald Reed, the head of PSP's Safety and Training unit at the time, about the training Styers should receive so that he could be a PIC again, a pilot qualified to fly an aircraft solo. As the head of the Safety and Training unit, Reed had the authority to decide how many in-flight training hours

Styers would be required to have. According to defendant Guido, there were no regulations or standards for a pilot who had been away for so long, and they discussed a need to develop a plan for Styers's return. Guido recommended that Styers be trained as if he were a new pilot because they were using a new helicopter and because he had been away for three years. Guido testified that his recommendation was based in part on a prior incident when a pilot who had returned after a prolonged absence did not receive sufficient retraining and almost had a serious accident.

For a pilot with previous turbine-helicopter experience the required training time is 150 hours; for a pilot with no prior turbine-helicopter experience the minimum is 250 hours. Because Guido knew that Styers had 100 turbine-helicopter hours from his previous time in the aviation section, he felt the safest course of action was to recommend that Styers have 150 hours.

There was another procedure for restoring a pilot to PIC status. Sometimes a pilot has not flown a helicopter for thirty days or more; it could have been because of illness or vacation. When that happens, the pilot is given a "recurrency flight" with a check pilot. It takes about two to five hours and involves an oral and in-flight evaluation.

There was no specific training schedule for Styers to train in the Agusta. Instead, Guido assigned shifts for the operation of the Agusta. The Bell Long Ranger helicopter became the spare that all of the APUs could use. It was available at

times to APU III, but according to defendant Waggoner, PSP's
aviation section commander, it was not practical to have Styers
get his 150-hour flight training on the Bell because the Agusta
was the primary aircraft used for missions at APU III and, as
noted, the Bell Long Ranger was a spare aircraft to be used by all
of the APUs. According to Styers, he was denied flight training on
the Bell.

Styers had to train with Guido. According to Waggoner,
this was done because Trooper Paden, the other pilot at APU III
who could provide such training, was training with another pilot,
and because Styers had to learn how to work with Guido in the
cockpit, APU III being a small unit.

From September 13, 2003, until January 9, 2004, Styers
did not have any hours of flight time with Guido. According to
defendants, this was because Styers had taken days off, had taken
other training, and because the aircraft was in maintenance.
According to Plaintiff, he had no flight time during this period
because Guido would not give him the hours. Plaintiff affirms he
was available to accumulate the hours even though he was also
taking time off.

Styers did not fly with Guido from his return to the
unit in September 2003 to January 2004. Styers did not have
confidence in Guido and was in fear of his physical safety.
Although Styers had no reason to think that Guido would not fly

safely, Styers believed that just being together with Guido created a hostile environment, in or out of the cockpit, given that Guido had told him that he had disagreed with the arbitrator's decision. However, Styers testified that there was no hostile and unsafe environment from September 2003 to January 2004 with Guido, simply because he was never in the cockpit with him during that time.

On January 6, 2004, there was a meeting between Styers, Guido and Waggoner concerning flight time for Styers. As a result of that meeting, Styers was supposed to train with Guido at least five hours per week and Guido was to provide a weekly progress report to Waggoner.

On January 29, 2004, Styers filed an administrative complaint alleging that he had been at APU III for more than three months and had not received a single hour of flight time from Guido because Guido refused to fly with him and refused to permit other instructors to fly with him. On January 30, 2004, defendant Zenk was appointed to handle the investigation into the charges. Styers wrote that he had no objections to Zenk's adjudicating the charges. (Doc. 28-5, p. 15). On March 11, 2004, Zenk issued a finding that there was no evidence that any member of BESO created, promoted or tolerated a hostile work environment with regard to Styers at any time or at any level. The investigation indicated that despite attempts to provide flight training, Styers used sick leave and other excuses to avoid training with Guido.

Guido provided Waggoner with weekly reports on how the training of Styers was progressing. From January 2004 through April 2004, Styers accrued approximately 5.3 hours of piloting time with Guido.

During the time that Sgt. Guido and Styers were flying Guido never did anything Styers thought was unsafe. During that time, Styers also flew with Cpl. Braid. Braid filed an Occupational Hazard Report on February 18, 2004, outlining his concerns about Plaintiff. Braid believed that Plaintiff had a poor attitude in the cockpit and refused to actively provide assistance. For his part, Plaintiff criticized Braid's flying ability.

B.  *The October 15, 2003, Preliminary Hearing*.

On October 15, 2003, Styers was scheduled to attend a preliminary hearing in a criminal matter which related to a road-rage incident that happened to Styers and his wife while Styers was off duty. Guido also attended the hearing. Styers did not put in to take leave that day and he went in his dress uniform as a potential witness, although he did not testify. According to Plaintiff, Guido ordered him to wear his dress uniform to the hearing. Prior to this date Styers had never worn his dress uniform to testify at a hearing where he was a witness to an off-duty incident, nor was he aware of anybody else from the state police ever doing so.

On October 15, 2003, Guido filed a complaint with the
Bureau of Professional Responsibility ("BPR") over the incident
because Styers attended the hearing while on duty and in uniform.
The next day, October 16, 2003, Styers filed a BPR complaint
against Guido claiming that Guido's attendance at the hearing was
retaliatory, vindictive and an ongoing "course of conduct by
Guido, from an already well established hostile work environment."
(Doc. 28-4, Ex. E, attach. 1).

On November 25, 2003, both BPR complaints were assigned
to Cpl. Gary R. Sawor to investigate. On January 9, 2004, Sawor
submitted a General Investigation Report. After reviewing Sawor's
report, on February 25, 2004, Capt. Rodney Patterson, notified
Guido and Styers that the complaint by Styers, that he was subject
to a hostile work environment and that Guido acted vindictively
and unprofessionally, was without merit. On March 1, 2004,
Patterson notified Guido that his complaint against Styers was
sustained and that appropriate administrative action would be
instituted. On March 9, 2004, Patterson issued a General
Investigation Report concluding that Guido did not act
unprofessionally and deciding to issue a Disciplinary Action
Report ("DAR") to Styers for not putting in for civilian leave
time to attend the preliminary hearing. On March 10, 2004, Major
Zenk issued a finding upholding the decision by Cpt. Patterson.

C.   *Plaintiff's Safety Complaints Concerning*
     *the Agusta Helicopter.*

According to the Aviation Section of the Pennsylvania State Police Manual, Chapter 1 on Safety Section 1.01A, the administration shall reinforce safe operations and attitudes through educational programs; provide safety-related information to all personnel; personally recognize safe work performance; maintain a nonrecrimination hazard-reporting system for all employees; enforce the uniform operating policies and procedures; and conduct periodic safety audits. All Section members of aviation must identify and make timely reports of safety issues.

In order to provide for an orderly compilation of information and ease of reporting, Section members are required to use an Operation Hazard Report ("OHR") without hesitation to report any situation that could adversely affect the safety, health and efficiency of operations. Anyone who had a safety concern about the safety of an aircraft or unsafe situation could fill out an OHR. If a person is required to report a safety incident with the FAA under FAA regulations he is also required to report it to the Pennsylvania State Police. However, reporting an unsafe condition to the Pennsylvania State Police via an OHR does not necessarily require that person to report it to the FAA.

Styers testified that he complained to Cpl. Braid and defendant Guido about safety issues concerning the Agusta. First, Styers believed that the Agusta shook excessively, although he was not aware of anything that measures the vibration frequency on the

9

Agusta, or if there was any way to check whether the vibration on the Agusta was so excessive as to make it unsafe.

Second, Styers thought the Agusta had overtorqued on several occasions before his return to APU III in September 2003, although he did not know about any overtorque issues until after January 2004. His concern about the overtorque was that the maintenance crew did not tear down the system to check it as recommended by the Agusta manual.

The director of the aviation inspection unit at the time was Charles Honer who has been inspecting aircraft since 1992. Prior to tearing down the system to check the torque, Honer contacted the manufacturer and asked for advice about the overtorque and the manual. The manufacturer informed him that it was not a problem because the duration range of the overtorque was not at the level where maintenance action was necessary. Honer asked that their advice be put in writing, and the manufacturer did so.

Contacting the manufacturer for advice concerning a potential problem was not unusual because the Agusta A119 was a new aircraft, and the manual was a revision of the Agusta 109 manual. Parts of the manual were incorrect and not revised to the specifications of the Agusta A119. However, as Styers saw it, the maintenance crew violated FAA regulations when they contacted the manufacturer because they were supposed to consult the aircraft's procedure manual.

Despite Styers's claim that he thought that the maintenance crew violated FAA regulations in the manner in which they handled the overtorque situation, Styers never reported his concern to the FAA or filled out an OHR. Honer, the supervisor on the maintenance crew, testified that it is his belief that the FAA regulations require the maintenance crew to perform maintenance pursuant to the manufacturers' directions, not necessarily to that found in the specific manual, and therefore going to the manufacturer and following its directives was not improper. Styers also testified that Honer and Tim Kelly, the mechanic responsible for maintenance of the Agusta, had more experience and background in maintaining the Agusta than Styers did.

Third, Styers was concerned about the craft's vibration absorbers. A vibration absorber cracked or broke prior to January 2004, before Styers ever piloted the Agusta. The vibration absorber was repaired, and Styers had no concerns about the manner in which it was fixed.

Styers could not point to any FAA regulations which addressed what was required to be done in the case of a craft experiencing overtorque or excessive shaking.

Fourth, Styers was concerned about a hanger bearing in the drive shaft while the Agusta was in for some type of maintenance at the end of 2003. Styers reported his concern about this to Kelly and Kelly's supervisor, Honer. Kelly and Honer were the only two people that Styers spoke to concerning the hanger

bearing. They told Styers that they had looked into it and that it was okay the way it was. Although the response received by Honer "didn't make sense" to Styers, Honer stated that it was repaired, and Styers testified he had to go by that because Honer was the maintenance expert. Although Styers did not believe the craft was airworthy, he did not report to anyone else his alleged concern about the state of the Agusta other than Honer. Styers did not fill out an OHR report about his concerns over the state of the craft to notify anyone of what his alleged safety concerns were with the Agusta.

Despite Styers's alleged concern over the airworthiness of the aircraft, he still requested flight time in the craft from Waggoner in January 2004. Styers never voiced his alleged concerns about the airworthiness of the Agusta to Waggoner or Guido.

D.   *The Gun Clip and Flight Helmet.*

In October 2003, Styers found out that one of his three issued gun clips was cracked, and he told Guido about it verbally. From October through December 5, 2003, he told Guido a couple more times about his cracked gun clip until Guido told him on the latter date to contact a Sergeant Zeamer for a new one. Styers did not contact Zeamer until January 6, 2004, about a month later.

Additionally, upon his return, Plaintiff had difficulty getting a serviceable flight helmet.

E.   *The Request for Transfer*.

On March 29, 2004, Waggoner asked if anyone wanted to put in for a preference transfer to APU I. Styers requested the transfer the following day but it was denied. Styers believed that he was entitled to get the transfer because he was the most senior pilot who applied, although he could not say whether the collective bargaining agreement required that the most senior applicant must be granted a preference transfer if they apply for it. A preference transfer is an intra-bureau transfer and therefore the provision in the collective bargaining agreement concerning granting the transfer to the most senior applicant does not apply.

III.   *Discussion*.

Public employees have a First Amendment right to be free from retaliatory conduct for speaking on matters of public concern. *McKee v. Hart*, 436 F.3d 165, 169 (3d Cir. 2006).

> To state a First Amendment retaliation claim, a plaintiff must allege two things: (1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action. *See, e.g., Phyllis Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005). The first factor is a question of law; the second factor is a question of fact. *Curinga v. City of Clairton,* 357 F.3d 305, 310 (3d Cir.2004).

*Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006). In turn, "[a] defendant may defeat the plaintiff's claim by

demonstrating that the defendant would have taken the same adverse action in the absence of plaintiff's protected conduct." *Id.*, n. 23 (cited case omitted).

In moving for summary judgment, Defendants essentially argue that there is no evidence that Plaintiff's use of the grievance process was a substantial factor in requiring him to have 150 hours of flight time on the Agusta before he could achieve PIC status again.[1] They provide four reasons. First, Lt. Reed, the head of PSP's Safety and Training unit, made the decision to impose the requirement on Plaintiff, not any of the defendants. We reject this argument because, as Plaintiff points out, the requirement was based on a recommendation by defendant Guido. Second, no one else had ever returned to an APU after such along absence (three years), and Plaintiff cannot show that he was treated differently than anyone else in a similar situation. We reject this argument because this is not part of the analysis of a First Amendment retaliation claim; it would bear more on an equal-protection claim. *See Hill*, *supra*, 455 F.3d at 239. Third, Plaintiff did not get the requisite 150 hours because he manipulated his schedule to avoid Guido, not because Guido refused to give him the training. We reject this argument because there is a material issue of disputed fact on this point. Plaintiff affirms

---

[1] Defendants rely on Title VII cases, *see* 42 U.S.C. § 2000e through 2000e-17, but this is not a Title VII case.

14

that he did have enough time to fly with Guido. We thus have to allow this issue to be resolved by a jury.

Fourth, Defendants argue there was no retaliation because the decision was based on safety factors; the 150-hour requirement for the Agusta was necessary for Plaintiff to be able to fly the helicopter safely as a PIC. As Plaintiff points out, the problem with this argument is that there was another way of qualifying Plaintiff as a PIC in light of the fact that the Agusta was equally unfamiliar to the other pilots, who had PIC status. Styers could have been tested on the Bell helicopter using a recurrency flight with a check pilot. This would have taken about five hours at most and would have put Styers in the same position as all the other pilots when they first trained on the Agusta. We recognize that Defendants contend that Plaintiff was away too long, about three years, for this method to be appropriate, but we conclude that this issue should be resolved by the fact finder.

Defendants next argue that his discipline after he attended a state-court preliminary hearing in his dress uniform could not be retaliatory because: (1) "Styers cannot point to any other individual from PSP who attended a hearing as a witness for an off duty incident that was treated any different than him"; and "a very comprehensive investigation into the matter was conducted by Cpl. Sawor who found that it was Styers who was trying to attend to a personal matter while on duty, and not a matter of

Guido trying to harass Styers." (Doc. 27, Defs.' Br. in Supp. at 19).

We reject these arguments. On the first one, as noted above, Plaintiff is not making an equal-protection claim. On the second, Defendants cite no authority for the proposition that an internal grievance process can provide the claim preclusion necessary to bar a civil rights action.

We next address Defendants' arguments that Plaintiff's difficulty in getting a properly fitting flight helmet and replacing a cracked gun clip were not retaliatory actions on their part. The first argument is that Plaintiff cannot show that someone else did not have to go over the same hurdles to get a helmet or a clip. We have already rejected this type of argument as not relevant to a First Amendment retaliation claim. Additionally, as to the clip, Defendants point out that Styers waited over a month after December 5, 2003, the date Guido told him to contact a Sergeant Zeamer to get a new clip, until January 6, 2004, to do so, and that under these circumstances, the delay in getting a workable clip cannot be considered retaliatory. We reject this argument because there is a low threshold for a retaliatory action. *O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006). Even something "as trivial as failing to hold a birthday party for a public employee" may be actionable. *Id.* (quoted case and internal quotation marks omitted).

Defendants next challenge the denial of the transfer as a retaliatory act, asserting that Plaintiff has provided no evidence that the denial was retaliatory and pointing out that merely being the most senior applicant (as Plaintiff was) did not automatically entitle Plaintiff to the transfer. However, we agree with Plaintiff that this issue should go to the jury.

Finally, Defendants attack that portion of the claim based on Plaintiff's complaints about the safety of the Agusta helicopter. We think the following defense arguments on this issue are properly made to the jury: (1) the record demonstrates that all of plaintiff's complaints about the safety of the Agusta were completely unfounded; (2) if plaintiff felt his concerns were legitimate, then his failure to submit an OHR or to report his concerns to the FAA was a dereliction of duty; and (3) it is completely illogical for plaintiff to have these safety concerns yet continue to ask to get flight time in the aircraft.

Defendants' other argument on the safety-complaint issue is that there is no evidence that Defendants ever knew about these complaints, Plaintiff having made most of his complaints to Tim Kelly, the mechanic responsible for maintenance of the Agusta at APU III, and Kelly's supervisor, Charles Honer.

In opposition, Plaintiff argues that a jury could conclude that defendant Garofalo knew about the complaints. Plaintiff cites Kelly's deposition at pages 8-10 as evidence that Styers complained to Kelley who, in turn, reported the complaint

`to Honer. Plaintiff also cites the Honer deposition at pages 17-18 that Honer routinely reported complaints to Lt. Reed, who reported to Defendant Garofalo. Based on this evidence, Plaintiff argues a reasonable jury could infer Honer told Reed and Reed told Garofalo.

Defendants have a strong argument here, but we believe it is not sufficient for an award of summary judgment on the safety-complaint issue.[2]

We will issue an appropriate order.

/s/William W. Caldwell
William W. Caldwell
United States District Judge

Date: June 26, 2007

---

[2]   It may also be that as part of Plaintiff's work duties, he had to report such safety issues. If so, he may not have a First Amendment retaliation claim for his safety complaints, *see Hill, supra*, 455 F.3d at 242, but Defendants do not make this argument, so we do not address it.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GREGORY STYERS,                    :
       Plaintiff
                            :

       vs.                         :   CIVIL NO. 1:CV-05-2127

BRET WAGGONER,                     :
JAMES GAROFALO,
RICHARD ZENK,                      :
DAVID GUIDO,
       Defendants               :


*O R D E R*


       AND NOW, this 26th day of June, 2007, it is ordered that
Defendants' motion (doc. 26) for summary judgment is denied.


                        /s/William W. Caldwell
                        William W. Caldwell
                        United States District Judge